# UNITED STATES DISTRICT COURT
## FOR THE
### DISTRICT OF VERMONT

VERMONT RIGHT TO LIFE COMMITTEE,  :
INC. and VERMONT RIGHT TO LIFE    :
COMMITTEE - FUND FOR INDEPENDENT  :
POLITICAL EXPENDITURES,           :
                                  :
       Plaintiffs,              :
                                  :
                                  :   Case No. 2:09-cv-188
   v.                          :
                                  :
WILLIAM H. SORRELL, in his        :
official capacity as Vermont      :
Attorney General; DAVID R. FENSTER,:
ERICA MARTHAGE, LISA WARREN,      :
T.J. DONOVAN, VINCENT ILLUZZI,    :
JAMES HUGHES, DAVID MILLER, JOEL  :
PAGE, WILLIAM PORTER, ALAN        :
FRANKLIN, MARC BRIERRE, THOMAS    :
KELLY, TRACY SHRIVER, and ROBERT  :
SAND, in their official capacities :
as Vermont State's Attorneys; and :
JAMES C. CONDOS, in his official  :
Capacity as Vermont Secretary     :
of State,                         :
                                  :
      Defendants.                  :


## Opinion & Order
## Cross-Motions for Summary Judgment

    Plaintiffs filed suit for declaratory and injunctive relief to bar enforcement against them of provisions of Vermont's campaign finance law.  They contend the challenged portions of the law, which require disclosure of election-related speech and limit the amount donors may contribute to "political committees," violate their constitutional guarantees of free

speech and due process of law, U.S. Const. amend. XIV, § 1. Pending are the parties' cross motions for summary judgment, ECF Nos. 166, 168.  The Court heard oral argument on the motions on April 30, 2012.  As this opinion explains, there are no genuine issues of material fact that warrant trial.  On the undisputed factual record before it, the Court **denies** Plaintiffs' motion and **grants** Defendants' motion in full.

## Background

### I.   The Parties

Plaintiff Vermont Right to Life Committee, Inc. ("VRLC") is a Section 501(c)(4) organization engaged in educational and political work "'to achieve universal recognition of the sanctity of human life from conception through natural death.'" First Am. & Verified Compl. ("FAVC") ¶ 10, ECF No. 132. Plaintiff Vermont Right to Life Committee - Fund for Independent Political Expenditures ("FIPE"), formed by VRLC in 1999, is a registered Vermont political committee.  FIPE's formation documents indicate that it would not "make monetary or in-kind contributions to candidates and it will not coordinate" with candidates.  Defs.' Mot. for Summ. J. Ex. C ("Organizational Docs."), at 3, ECF No. 168-5.  FIPE was active in the 2010 election cycle, but asserts that, prior to that time, it had not been active since at least 2002.  Although not a party in this action, a noteworthy player is Vermont Right to Life Committee,

Inc. Political Committee ("PC").  PC was created by VRLC to engage in federal and state campaign activities, including making direct contributions to pro-life candidates.  Defendants are Vermont officials with authority to enforce Vermont campaign finance law (the "State").

## II.  The Challenged Statutes

For the last century, Vermonters' concerns about the influence of money in politics have moved the Vermont Legislature to enact and refine a body of campaign finance law governing state elections.  *See Landell v. Sorrell*, 118 F. Supp. 2d 459, 464-70 (D. Vt. 2000), *aff'd in part*, *vacated in part*, 382 F.3d 91 (2d Cir. 2004), *rev'd in part sub nom.*, *Randall v. Sorrell*, 548 U.S. 230 (2006).  This action relates to two classes of provisions contained in Vermont's campaign finance statutes: (1) a series of disclosure requirements for election spending, and (2) a $2000 limit on the amount donors can contribute to political committees.

### A. Disclosure Provisions

The first set of disclosure regulations are registration and periodic reporting required of organizations that meet the statutory definition of a "political committee" (referred to alternatively here as a "PAC").  A PAC is:

> any formal or informal committee of two or more
> individuals, or a corporation, labor organization,
> public interest group, or other entity, not including

> a political party, which receives contributions of
> more than $500.00 and makes expenditures of more than
> $500.00 in any one calendar year for the purpose of
> supporting or opposing one or more candidates,
> influencing an election, or advocating a position on a
> public question in any election or affecting the
> outcome of an election.

Vt. Stat. Ann. tit. 17, § 2801(4).  "Contribution" and

"expenditure," terms used in the PAC definition, are also

defined by statute.  A "contribution" is "a payment,

distribution, advance, deposit, loan or gift of money or

anything of value, paid or promised to be paid to a person for

the purpose of influencing an election, advocating a position on

a public question, or supporting or opposing one or more

candidates in any election," not including unpaid volunteer

services or a personal loan from a lending institution.  *Id.* §

2801(2).  An "expenditure" is "a payment, disbursement,

distribution, advance, deposit, loan or gift of money or

anything of value, paid or promised to be paid, for the purpose

of influencing an election, advocating a position on a public

question, or supporting or opposing one or more candidates."

*Id.* § 2801(3).

Attaining PAC status creates obligations on the part of the

nascent political committee.  The PAC must designate a single

checking account to fund any expenditure and name a treasurer to

maintain that account.  *Id.* § 2802.  Within ten days of

surpassing the $500 contribution and expenditure threshold, it

4

must register with the Vermont Secretary of State (the "Secretary"), providing its name, address, the location of its bank account, and its treasurer's name. *Id.* § 2831(a).

In addition to registering, it must file "campaign finance reports" with the Secretary at regular intervals. Vermont elects its state officials to two-year terms, such that every even-numbered year is an election year and every odd-numbered year is an off-year. In odd-numbered years, PACs file campaign finance reports once, on July 15. *Id.* § 2811(d). In election years, PACs must report five or six times, twice prior to the primary election, twice between the primary and the general election, and once or twice following the general election. Decl. of David Crossman, Vt. Elections Adm'r, Defs.' Mot. for Summ. J. ("Crossman Decl.") ¶ 9, ECF No. 71-30.

Each campaign finance report must list the name, address, and date of contribution for each person who contributed more than $100, contain a description of every expenditure, and specify any loans, debts or obligations on the PAC's books. Vt. Stat. Ann. tit. 17, § 2803(a). The law additionally requires PACs to total their expenditures and contributions for the campaign to date, itemized by monetary and non-monetary contributions. *Id.* §§ 2803(a)(2), (b). The Secretary makes campaign finance reports available for public inspection at its Montpelier offices and in a searchable form on its website.

Separately, Vermont law mandates disclosure of two distinct categories of election speech.  For these categories, it does not matter whether the speaker first qualifies as a PAC.  One category is "electioneering communications," which refers to:

> any communication, including communications published in any newspaper or periodical or broadcast on radio or television or over any public address system, placed on any billboards, outdoor facilities, buttons or printed material attached to motor vehicles, window displays, posters, cards, pamphlets, leaflets, flyers, or other circulars, or in any direct mailing, robotic phone calls, or mass e-mails that refers to a clearly identified candidate for office and that promotes or supports a candidate for that office, or attacks or opposes a candidate for that office, regardless of whether the communication expressly advocates a vote for or against a candidate.

Vt. Stat. Ann. tit. 17, § 2891.  An identification requirement attaches to most electioneering communications, as they must:

> contain the name and address of the person, political committee, or campaign who or which paid for the communication.  The communication shall clearly designate the name of the candidate, party, or political committee by or on whose behalf the same is published or broadcast.

Id. § 2892.  Excluded from the electioneering communication identification requirement, however, are "lapel stickers or buttons," as well as "electioneering communications made by a single individual acting alone who spends, in a single two-year general election cycle, a cumulative amount of no more than $150.00 on those electioneering communications."  Id.

The other speech category is mass media activities ("MMA"), which covers "television commercials, radio commercials, mass mailings, literature drops, newspaper and periodical advertisements, robotic phone calls, and telephone banks which include the name or likeness of a clearly identified candidate for office." *Id.* § 2893(a).  In the lead up to an election, certain MMAs must be reported:

> In addition to any other reports required to be filed under this chapter, a person who makes expenditures for any one mass media activity totaling $500.00 or more within 30 days of a primary or general election shall, for each activity, file a mass media report with the secretary of state and send a copy of the mass media report to each candidate whose name or likeness is included in the activity within 24 hours of the expenditure or activity, whichever occurs first.  For the purposes of this section, a person shall be treated as having made an expenditure if the person has executed a contract to make the expenditure.  The report shall identify the person who made the expenditure with the name of the candidate involved in the activity and any other information relating to the expenditure that is required to be disclosed under the provisions of subsections 2803(a) and (b) of this title.

*Id.* § 2893(b).  The Office provides a standard, one-page MMA reporting form.  Crossman Decl. Ex. 11.  Unlike campaign reports, MMA reports do not require PACs to disclose the names of contributors.  Vt. Stat. Ann. tit. 17, § 2893(b); Crossman Decl. ¶ 22.[1]

---

[1]     The Second Circuit found prior versions of Vermont's MMA and electioneering communications provisions facially unconstitutional. *Vt. Right to Life Comm. v. Sorrell* (*VRLC I*),

### B. $2000 Limit on Individual Contributions to PACs

Apart from the challenge to disclosure rules, at issue also is a restriction on finances.  Vermont limits the amount a PAC may accept from any one contributor.  Vt. Stat. Ann. tit. 17, § 2805(a).  The law provides that: "A political committee . . . shall not accept contributions totaling more than $2,000.00 from a single source, political committee or political party in any two-year general election cycle."  *Id.*

### III. Procedural History

Plaintiffs filed their initial verified complaint on August 14, 2009, and later moved for a TRO, a preliminary injunction, and an expedited trial.  ECF Nos. 1, 3, 5, 6, 36.  The Court granted the request to consolidate the preliminary injunction hearing with a merits trial, and also approved a 45-day window for discovery.  ECF No. 52.  The parties filed cross-motions for summary judgment, ECF Nos. 70-71, just after the Supreme Court issued its decision in *Citizens United v. Federal Election Commission*, 130 S. Ct. 876 (2010).  Plaintiffs moved to amend

---

221 F.3d 376 (2d Cir. 2000).  In so doing, it reversed this Court's limiting constructions of the statutory language and determination that, so read, the laws passed constitutional muster.  *VRLC I*, 19 F. Supp. 2d 204 (D. Vt. 1998).  Both the appellate and trial court decisions in *VRLC I* relied on the assumption that Vermont could not require disclosure of political speech other than "express advocacy."  221 F.3d at 386; 19 F. Supp. 2d at 213.  Subsequent Supreme Court decisions have unseated that assumption, as described in detail in the Discussion section that follows.

their complaint, reflecting changes in the law due to that seminal ruling and as a result of their voluntary dismissal of a plaintiff party.  ECF Nos. 99, 120.  The Court granted leave to amend and permitted time for supplemental discovery.  ECF No. 129.  Plaintiffs filed the twelve-count FAVC on July 19, 2010.[2] During discovery, in August 2011, the Court entered a stipulated protective order that permitted the State to obtain internal meeting minutes and correspondence on the question of VRLC's major purpose and FIPE's activities, but required the State to file under seal any such evidence it referenced in its findings. ECF Nos. 157, 161.  The parties filed their motions and briefing was completed on December 9, 2011.

Plaintiffs either already are subject to or fear they will be bound by the disclosure and contribution limit provisions, restraining their speech and exposing them to criminal and civil penalties.[3]  VRLC alleges that while it is not currently registered as a PAC, its speech might bring it within the PAC definition's compass.  It has already or plans to distribute mass e-mails, newsletters, brochures, petitions, newspaper

---

[2]     The parties later dismissed by stipulation Count 9 of the FAVC, concerning related expenditures.  FAVC ¶¶ 143-47; Stipulation to Dismiss Count 9 of Pls.' Verified Compl., ECF No. 145.

[3]     Knowing and intentional violations of the PAC provisions carries civil and criminal penalties, while any violation of campaign finance rules may result in civil fines, investigations, and enforcement actions by the State.  *See* Vt. Stat. Ann. tit. 17, §§ 2806, 2806a.

columns, fundraising letters, a web site, and a radio ad discussing pro-life issues and Vermont elected officials.  VRLC contends Vermont's PAC definition is unconstitutionally vague, in violation of the Fourteenth Amendment's Due Process Clause, and overbroad, contravening First Amendment's protection of political speech.[4]  It further states that some of the media it wishes to publish could incite enforcement against it of Vermont's electioneering communications and MMA requirements.  VRLC argues those requirements are unenforceable as well because they are unconstitutionally vague and overbroad.

FIPE, already registered as a Vermont PAC, separately contests the $100 contribution reporting threshold for PACs as an unconstitutional burden on speech.  In addition, FIPE contends the $2000 limit on individual contributions it may receive is unconstitutional as applied to it, since it alleges it makes only independent expenditures.[5]  Should the Court deem that part of the law unconstitutional as applied to FIPE, PC

_____

[4]    The First Amendment is incorporated into the Fourteenth Amendment and applies to limit state action.  *See, e.g.*, *Lusk v. Vill. of Cold Spring*, 475 F.3d 480, 485 (2d Cir. 2007).

[5]    FIPE's challenge to the contribution limit is as-applied only.  The parties agree that FIPE cannot launch a facial attack because FIPE remains bound by this Court's final judgment in an earlier case holding the provision facially constitutional.  Final Judgment Order 2, *Landell v. Sorrell*, No. 2:99-cv-146-wks (D. Vt. Sept. 26, 2007), ECF No. 209; *see Landell*, 382 F.3d at 139-40, 144.  The Supreme Court did not examine that portion of the law when it struck down other Vermont contribution limits.  *See Randall*, 548 U.S. 230.

would make an in-kind contribution to FIPE of a supporter
mailing list, valued at over $2000.

**Discussion**

## I.   Standard of Review

Summary judgment is "'only warranted upon a showing that
there is no genuine issue as to any material fact and that the
moving party is entitled to judgment as a matter of law.'"
*Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.,* 473
F.3d 450, 455 (2d Cir. 2007) (quoting *Feingold v. New York,* 366
F.3d 138, 148 (2d Cir. 2004)); Fed. R. Civ. P. 56(a).  "In
determining whether there is a genuine issue of material fact, a
court must resolve all ambiguities, and draw all inferences,
against the moving party."  *Beth Israel Med. Ctr. v. Horizon
Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 579 (2d
Cir. 2006).  The moving party will be "entitled to a judgment as
a matter of law [if] the non-moving party 'fails to make a
showing sufficient to establish the existence of an element
essential to that party's case.'"  *Tufariello v. Long Island
R.R.,* 458 F.3d 80, 85 (2d Cir. 2006) (quoting *Celotex Corp. v.
Catrett,* 477 U.S. 317 (1986)).

Plaintiffs appended a statement of undisputed material
facts to their motion for summary judgment.  ECF No. 166-4.[6]  The

---

[6]     The Court treats the FAVC, since it is verified, as an
affidavit offered in support of Plaintiffs' motion for summary

State's motion included its own statement of undisputed facts,
ECF No. 168-2.  The State also attached to its response brief a
statement of disputed facts, which contested Plaintiffs'
showing.  ECF No. 170-1.  Plaintiffs did not file an opposing
statement of disputed facts in return.  Instead, they made clear
in their briefing and at oral argument that they believe there
are no genuine issues of material fact for the Court to resolve
and that they are entitled to judgment as a matter of law
regardless of the State's evidence.  Pls.' Summ. J. Resp. Br. 2,
ECF No. 171; Pls.' Summ. J. Reply Br. 1-2, ECF No. 176; Pls.'
Supp'l Filing 6, ECF No. 193.  The Court accordingly considers
the record before it undisputed, and it finds the issues ripe
for decision on summary judgment.  *See* 10A C. Wright, A. Miller,
& M. Kane, *Federal Practice and Procedure* § 2723 (3d ed.)
(noting admissions in briefs may be used to determine whether
there is an issue of fact for trial "since they are functionally
equivalent to 'admissions on file,' which are expressly

---

judgment.  *See Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir.
1995) ("A verified complaint is to be treated as an affidavit
for summary judgment purposes, and therefore will be considered
in determining whether material issues of fact exist, provided
that it meets the other requirements for an affidavit under Rule
56[].");  Fed. R. Civ. P. 56(c)(4) (affidavits and declarations
"must be made on personal knowledge, set out facts that would be
admissible in evidence, and show that the affiant or declarant
is competent to testify on the matters stated").

mentioned in Rule 56(c)" as accepted forms of proof for summary
judgment).

**II.  *Citizens United***

*Citizens United* looms large over the discussion that
follows.  Before launching into a claim-by-claim analysis, it is
worthwhile to set forth the holding and central reasoning in
that case.  *Citizens United* produced a two-fold ruling:
"Government may regulate corporate political speech through
identification and disclosure requirements, but it may not
suppress that speech altogether."  130 S. Ct. at 886.

The Supreme Court made clear that there is no state
interest sufficient to justify regulation that limits corporate
and union independent political expenditures.  It reasoned that
the only valid governmental interest in regulating campaign
expenditures is preventing the reality or appearance of *quid-
pro-quo* corruption, and independent expenditures, precisely
because they are uncoordinated with candidates, pose no such
threat.  130 S. Ct. at 908-09.[7]  That take on campaign spending

---

[7]     A special three judge panel of the U.S. District Court
for the District of Columbia, affirmed without opinion by the
Supreme Court, relied on a different rationale in denying a
challenge to 2 U.S.C. § 441e(a)'s prohibition on foreign
national contributions and expenditures in federal, state, or
local campaigns.  *Bluman v. Fed. Election Comm'n*, 800 F. Supp.
2d 281, 283 (D.D.C. 2011), *aff'd*, 132 S. Ct. 1087 (2012).  The
three judge panel found the government interest in "exclud[ing]
foreign citizens from activities that are part of democratic

is at least as old as *Buckley v. Valeo*, in which the Supreme Court remarked that "[u]nlike contributions, such independent expenditures may well provide little assistance to the candidate's campaign and indeed may prove counterproductive." 424 U.S. 1, 47 (1976). *Citizens United* also stands for the proposition that the First Amendment does not permit government to use a speaker's corporate form as justification to regulate its independent expenditures. 130 S. Ct. at 913. The Court accordingly struck down 2 U.S.C. § 441b's total ban on corporate and union spending from general treasury funds for express advocacy or electioneering communications, forms of regulated independent expenditures. 130 S. Ct. at 913.[8] It overruled *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990), and, in part, *McConnell v. Federal Election Commission*, 540 U.S. 93, 203-09 (2003), which had permitted limits on such speech.

In reaching that result, *Citizens United* dispatched the counterargument that the law's provision for forming a PAC was a

---

self-government in the United States" sufficient to justify the law's expenditure ban. *Id.*

[8]     Express advocacy refers to communications that direct the viewer in the manner of words like "'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject.'" *Buckley*, 424 U.S. at 44 n.52; *see Fed. Election Comm'n v. Mass. Citizens for Life, Inc.* (*MCFL*), 479 U.S. 238, 249-50 (1986). Under federal law, an electioneering communication is "any broadcast, cable, or satellite communication" that "refers to a clearly identified candidate for Federal office" and that is made within sixty days before a general election and thirty days before a primary election. 2 U.S.C. § 434(f)(3)(A)(i).

suitable alternative to direct corporate or union speech. 130
S. Ct. at 897. Previously, a corporation like Citizens United
could only engage in express advocacy or electioneering speech
indirectly, by creating a PAC to which only its stockholders or
employees could contribute. *Id.* at 887-88. The Court found the
PAC approach did not alleviate the electioneering ban's speech-
repressive effects, because such PACs did not allow the
corporation or union to speak for itself and were subject to
extensive registration, reporting and disclosure requirements.
*Id.* at 897-98. Thus, federal PACs were "burdensome
alternatives," and posed "onerous restrictions" that could
hinder corporate and union speech during a campaign. *Id.* That
critique reflected a longstanding skepticism of federally-
defined PACs' ability to substitute for pure political speech.
*See Fed. Election Comm'n v. Wis. Right to Life, Inc.* (*WRTL II*),
551 U.S. 449, 477 n.9 (2007); *MCFL*, 479 U.S. at 253-56.

At the same time, eight justices joined the portion of the
opinion upholding the identification and disclosure requirements
that also applied to Citizens United. 130 S. Ct. at 886, 913-
16. That part affirmed another longstanding view: in spite of
the burdens they pose to political speech, "disclosure
requirements certainly in most applications appear to be the
least restrictive means of curbing the evils of campaign
ignorance and corruption that Congress found to exist."

*Buckley*, 424 U.S. at 68.  At least since *Buckley*, the Supreme Court has recognized that different government interests support disclosure than support limits on spending in campaigns, namely: (1) informing voters as to the "sources of a candidate's financial support," enabling voters to better "evaluat[e] those who seek office"; (2) limiting corruption and its appearance by making large contributions and expenditures transparent; and (3) gathering data to discover any violations of the campaign finance laws.  *Id.* at 66-68.

The Supreme Court relied on the first rationale to justify the provisions applied to Citizens United.  130 S. Ct. at 914-16.  To gauge their constitutionality, it applied *Buckley*'s "'exacting scrutiny'" test, which requires a "'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest."  *Id.* at 914 (citing *Buckley*, 424 U.S. at 64, 66); *see also John Doe No. 1 v. Reed*, 130 S. Ct. 2811, 2818 (2010) (confirming exacting scrutiny applies to disclosure requirements).  The provisions survived scrutiny. 130 S. Ct. at 915-16.[9]

---

[9]    The court also affirmed that organizations may make as-applied challenges to disclosure requirements when such laws create "a reasonable probability that the group's members would face threats, harassment, or reprisals if their names were disclosed."  130 S. Ct. at 916 (citing *McConnell*, 540 U.S. at 198).  Plaintiffs have not challenged Vermont's law under that rationale.

In reaching that conclusion, the Court in *Citizens United* explicitly rejected the argument that disclosure could only cover express advocacy or its functional equivalent, a test distilled by prior cases for as-applied challenges to electioneering spending limits. 130 S. Ct. at 915. This statement assured the vitality of the part of *McConnell* in which the Court "rejected the notion that the First Amendment requires Congress to treat so-called issue advocacy differently from express advocacy." 540 U.S. at 194. The *Citizens United* court made clear that the power to require disclosure extends beyond the power to limit speech, analogizing that although Congress "has no power to ban lobbying itself," it may require registration and disclosure of lobbyists. 130 S. Ct. at 915 (citing *United States v. Harriss*, 347 U.S. 612, 625 (1954)). Indeed, *Citizens United* went further toward solidifying this principle, explicitly endorsing a system of relatively unrestricted political speech paired with "effective disclosure," noting that many of Congress's findings of influence-peddling in promulgating campaign finance legislation "were premised on a system without adequate disclosure." 130 S. Ct. at 916.

With those principles in mind, the Court advances to Plaintiffs' constitutional claims. As described in Part III below, Plaintiffs have not succeeded in showing that Vermont's

17

disclosure provisions are either vague or regulate in excess of First Amendment protections.  Furthermore, as discussed in Part IV, below, FIPE's as-applied challenge to Vermont's limit on individual contributions to PACs also fails.  The State has provided uncontested evidence to show that FIPE and PC are deeply interrelated, making it unclear whether contributions to FIPE are spent on independent expenditures or contributions to candidates.

**III. Disclosure-Related Challenges**

    A. <u>Vagueness</u>

A law is vague, violating the Due Process Clause, when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008); *see also Buckley*, 424 U.S. at 77.  The concern for vagueness is heightened in the context of the First Amendment.  *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982).  The First Amendment requires "breathing space" and statutes that press on its protections "must be narrowly drawn and represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society." *Broadrick v. Okla.*, 413 U.S. 601, 611-12 (1973). Still, "'perfect clarity and precise guidance have never been

18

required even of regulations that restrict expressive activity.'" *Williams*, 553 U.S. at 304 (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 794 (1989)); *see also Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) ("Condemned to the use of words, we can never expect mathematical certainty from our language.").

A plaintiff may challenge a law as unconstitutionally vague both as applied to its own speech and facially. *See Vill. of Hoffman Estates*, 455 U.S. at 494-95. A facial vagueness challenge, however, will succeed only on a showing that the law "is impermissibly vague in all of its applications." *Id.* at 495. Moreover, "'[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2719 (2010) (quoting *Vill. of Hoffman Estates*, 455 U.S. at 495).

While VRLC styles its claims as both as-applied and facial challenges, it does little to craft an as-applied vagueness claim, offering minimal explanation of how the law is unconstitutional as it pertains to the specific communications it either has made or hopes to publish. *See* Pls.' Summ. J. Br. 13 & n.11, ECF No. 166-1; *Iowa Right to Life Comm., Inc. v. Tooker*, 795 F. Supp. 2d 852, 863 n.16 (S.D. Iowa 2011). By largely proceeding as if vagueness is a question of law shorn of

context, VRLC seems to argue the provisions here must be vague
as applied to it because they are vague in all applications.
That argument flips on its head the general "preference for as-
applied review even where First Amendment rights are
implicated." *United States v. Farhane*, 634 F.3d 127, 138
n.9 (2d Cir. 2011).  Furthermore, if the law were to clearly
apply to VRLC's conduct in some aspect, VRLC could not attack it
facially for vagueness.  *Humanitarian Law Project*, 130 S. Ct. at
2718-19 (stating for that reason, "[w]e consider whether a
statute is vague as applied to the particular facts at issue");
*Nat'l Org. for Marriage, Inc. v. McKee*, 669 F.3d 34, 43 (1st
Cir. 2012) (noting, "[t]hus, appellants are not only unable to
bring a facial vagueness challenge to section 1056-B, but their
failure to develop their as-applied challenges also would allow
us to reject those claims summarily if we were so inclined").
Putting that concern to one side, however, VRLC's vagueness
claims also do not succeed on their merits.

>    1.   *PAC, Contribution, & Expenditure Definitions*

VRLC contends the PAC definition and similar language in
the definitions of contribution and expenditure are vague.  With
respect to PACs, the questioned language applies PAC status to
those entities accepting contributions or engaging in
expenditures "for the purpose of supporting or opposing one or
more candidates, influencing an election, or advocating a

position on a public question in any election or affecting the
outcome of an election." Vt. Stat. Ann. tit. 17, § 2801(4).

VRLC argues first that the language "for the purpose of . .
. influencing an election . . . or affecting the outcome of an
election" is vague.  Regardless of the stand-alone merits of
that claim, "[i]n evaluating a facial challenge to a state law,
a federal court must, of course, consider any limiting
construction that a state court or enforcement agency has
proffered." *Vill. of Hoffman Estates*, 455 U.S. at 489 n.5.  A
state court already has had occasion to narrow the statutory
language challenged here. *Vt. v. Green Mountain Future*, Civ.
Div. No. 758-10-10 Wncv, slip op. (Wash. Super. Ct. June 28,
2011) (Crawford, J.), http://www.vermontjudiciary.org/20112015%
20Tcdecisioncvl/2011-6-30-1.pdf.  In that case, Vermont brought
an enforcement action against Green Mountain Future, a Vermont
organization funded by the Democratic Governors Association that
aired advertisements critical of Republican gubernatorial
candidate Brian Dubie prior to the 2010 election. *Id.* at 1.
Vermont sought civil penalties from Green Mountain Future for
failing to adhere to the PAC registration and reporting
requirements and for not identifying itself in electioneering
communications. *Id.* at 1-2.  Green Mountain Future
counterclaimed, challenging the disclosure provisions as vague
and overbroad, but Judge Crawford rejected its arguments. *Id.*

at 14.  On the PAC definition, he found the phrase "for the purpose of . . . influencing an election . . . or affecting the outcome of an election" not vague and interpreted it to mean the same as simply "supporting or opposing one or more candidates." *Id.* at 12.  As the decision further noted, the language "ensures that if the ad cannot reasonably be viewed as referring to a candidate, the registration requirements are not triggered." *Id.*  Thus, the decision removed the significance of the "influencing" and "affecting" phrases that are subject to challenge here.

VRLC urged at oral argument that Judge Crawford, while upholding the PAC definition against vagueness, was actually implying that the words "influencing" and "affecting" give "support" and "oppose" an expansive, and therefore less clear, scope.  It referred the Court to the State's characterization of the 1988 amendment that added "influencing," as having "broadened" the PAC definition.  *See* Defs.' Summ. J. Br. 16, ECF No. 168-1.  While creative, that argument does not square with the Court's reading of *Green Mountain Future.*  That decision goes on to characterize the PAC and electioneering communications definitions as "differ[ing] little in effect," slip op. at 13, even though the latter uses "support," "promote," "attack," and "oppose" without the words "influencing" or "affecting," or their equivalent, *see* Vt. Stat.

Ann. tit. 17, § 2891.

Since *Green Mountain Future*, further developments have bolstered its narrowing construction.  The Vermont Attorney General's Office publicly affirmed the narrowing effect of *Green Mountain Future* and a subsequent decision by Judge Crawford, *Vermont v. Republican Governors Association*, Defs.' Supp'l Filing Ex. 3, ECF No. 192-3, on the PAC definition in declining to press charges against a group that had failed to register as a PAC.  *See* Office of the Attorney General, Press Releases: Attorney General's Office Concludes Investigation (Feb. 29, 2012), Defs.' Supp'l Filing Ex. 2, ECF No. 192-2.  In addition, the State represents that, on the appeal of *Green Mountain Future* currently pending before the Vermont Supreme Court, it will advocate in favor of adopting and affirming *Green Mountain Future*'s narrowing construction, and that it is estopped from arguing for a different reading of the statute in any subsequent proceedings.  Defs.' Supp'l Filing 2, ECF No. 192.

The Court accepts the ruling in *Green Mountain Future* as a limiting construction of Vermont law and adopts it here.  *See Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 66-67 (1st Cir. 2011), *cert. denied*, 132 S. Ct. 1635 (2012) (relying on a Maine administrative guideline for a narrowing construction of "influencing").  Even further, were this Court in the same position as the Vermont court, it would have reached the same

conclusion in interpreting otherwise expansive language like

"influencing" and "affecting" in their statutory context. *See*

*id.* at 65 ("*Buckley's* concerns aside, the term 'influencing'

does present some vagueness problems."); *see also Yamada v.*

*Weaver*, Civ. No. 10-497 JMS-RLP, 2012 WL 983559, at *18-20 &

n.18 (D. Haw. Mar. 21, 2012) (adopting a narrowing gloss for

"'to influence'" and "'for the purpose of influencing'" in a PAC

definition without a state court decision on point).  Neither

party has asked the Court to stay consideration of this case

pending the Vermont Supreme Court's review, nor does the Court

find a stay warranted in light of the lengthy delays in this

case and the imminent approach of the 2012 elections.[10]

Accordingly, the Court reads "for the purpose of . . .

influencing an election . . . or affecting the outcome of an

election" as simply, "supporting or opposing one or more

candidates."

VRLC also asserts the law as narrowly construed in *Green*

*Mountain Future* remains vague.  This Court agrees with the

Vermont court that "supporting or opposing one or more

candidates" is sufficiently clear.  *Green Mountain Future*, slip

op. at 13.  The Supreme Court in *McConnell* determined that

"[t]he words 'promote,' 'oppose,' 'attack,' and 'support,'" in

---

[10]    Of course, the Vermont Supreme Court's ultimate
interpretation of Vermont law will bind this Court.  *See*
*Portalatin v. Graham*, 624 F.3d 69, 84 (2d Cir. 2010) (en banc).

campaign finance law, "'provide explicit standards for those who apply them'" and "'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited.'"  540 U.S. at 170 n.64 (quoting *Grayned,* 408 U.S. at 108-09); *see also McKee*, 649 F.3d at 63 (finding "promoting," "support," and "opposition" not vague in the context of several Maine campaign finance law definitions); *Nat'l Org. for Marriage v. Daluz*, 654 F.3d 115, 120 (1st Cir. 2011) (finding the phrase "'support or defeat a candidate'" was not vague when it referred to independent expenditures that must be disclosed under Rhode Island law); *N.C. Right to Life, Inc. v. Leake* (*NCRL III*), 525 F.3d 274, 318 (4th Cir. 2008) (Michael, J. dissenting).

It is true that the Fifth Circuit found vague Louisiana's PAC definition, which also incorporated the phrase "'supporting or opposing.'"  *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 663-66 (5th Cir. 2006), *cert. denied*, 549 U.S. 1112 (2007).  But in that statute, "'supporting or opposing'" was paired with, "'or otherwise influencing,'" a phrase that potentially broadened the definition's scope and that had not been narrowed by state decision as in Vermont.  *Id.*  The decision in *Green Mountain Future* distinguishes this case from *Carmouche*.  On the strength of the clear statement in *McConnell* and subsequent cases, the Court concludes "supporting or opposing one or more candidates" is not vague.

Under the same reasoning, VRLC's vagueness challenge to "contribution" and "expenditure," which are separately defined constituent pieces of the PAC definition, does not succeed. *See* Vt. Stat. Ann. tit. 17, § 2801(4). Both terms refer to funds "for the purpose of influencing an election, advocating a position on a public question, or supporting or opposing one or more candidates." *Id.* §§ 2801(2), (3). "Advocating a position on a public question" is both clear and plainly inapplicable to VRLC, since "public question" is separately defined to mean "an issue that is before the voters for a binding decision." *Id.* § 2801(8). As relevant, the potentially vague language boils down to: "for the purpose of influencing an election . . . or supporting or opposing one or more candidates." *Id.* §§ 2801(2), (3). So limited, it is nearly identical to the language in the PAC definition *Green Mountain Future* construed narrowly and upheld. Even though *Green Mountain Future* did not discuss "contribution" and "expenditure," its reasoning makes "'such a construction . . . reasonable and readily apparent.'" *Stenberg v. Carhart*, 530 U.S. 914, 944-945 (2000) (quoting *Boos v. Barry*, 485 U.S. 312, 330 (1988)). For the same reason that language is not vague in the context of the PAC definition, it is not vague as used in defining contribution and expenditure. The Court

finds the PAC, contribution, and expenditure definitions, as limited in *Green Mountain Future*, not unconstitutionally vague.[11]

>    2.    *Electioneering Communications & MMA*

VRLC argues three grounds for finding the electioneering communications and MMA provisions infirm for vagueness.  First, it objects to essentially the same definitional language as the "supporting or opposing" clause from the PAC, contribution, and expenditure context.  An electioneering communication "promotes or supports a candidate for that office, or attacks or opposes a candidate for that office, regardless of whether the communication expressly advocates a vote for or against a candidate."  Vt. Stat. Ann. tit. 17, § 2891.  For the reasons just described, such language is not vague.  Indeed, it is nearly verbatim the phrase interpreted in *McConnell*, 540 U.S. at 170 n.64.  *Compare* Vt. Stat. Ann. tit. 17, § 2891, *with* 2 U.S.C § 431(20)(A)(iii).[12]

---

[11]    VRLC contends the campaign finance report requirements, contained in Vt. Stat. Ann. tit. 17, § 2803, are vague since they use the terms "contribution" and "expenditure." Since the Court does not find "contribution" and "expenditure" vague, it rejects this challenge.

[12]    Similarly, VRLC objects to the MMA reporting provision because it uses the term "expenditure," which VRLC argues is vague.  *See* Vt. Stat. Ann. tit. 17, § 2893(b).  Since the Court has rejected the argument that "expenditure" is defined vaguely, it also rejects this challenge.

Second, focusing on the electioneering communications identification requirement, VRLC argues the phrase "on whose behalf" is vague.  That provision reads:

> All electioneering communications shall contain the
> name and address of the person, political committee,
> or campaign who or which paid for the communication.
> The communication shall clearly designate the name of
> the candidate, party, or political committee by or *on
> whose behalf* the same is published or broadcast.

Vt. Stat. Ann. tit. 17, § 2892 (emphasis added).  The Court finds the text straightforward.  The first sentence requires the communication sponsor to include his or her name and address on the communication.  The second sentence applies in the instance in which the sponsor is not also the communication's beneficiary.  When that is the case, the communication must include the name, but need not include the address, of the beneficiary.  Crossman Decl. ¶ 32 ("If the communication is not made on the behalf of the person or entity who paid for it, then the communication must also clearly designate the name of the candidate, party, or PAC on whose behalf it was published or broadcast.").  VRLC argues that the phrase leaves unclear when a communication is made "on behalf of" another party so as to trigger the second sentence's requirement.

However, "on whose behalf," as underscored by its use elsewhere in related Vermont law, contemplates an agreement between the sponsor and the beneficiary to run the

communication, not incidental or uncoordinated aid.  *See Farhane*, 634 F.3d at 142 ("we do not look at statutory language in isolation to determine if it provides adequate notice of conduct proscribed or permitted. Rather, we consider language in context").  For instance, a "related campaign expenditure made on the candidate's behalf" must be "intentionally facilitated by, solicited by or approved by the candidate or the candidate's political committee." Vt. Stat. Ann. tit. 17, § 2809(c); *Randall*, 548 U.S. at 238.  The same is true of lobbyist disclosure requirements.  Vt. Stat. Ann. tit. 2, § 263(c)(4) ("the lobbyist shall provide the name of the employer, the name of the person, group or coalition on whose behalf he or she lobbies and a description of the matters for which lobbying has been engaged by the employer").[13]  Since "on whose behalf"

---

[13]     Even if the statutory language permitted a degree of uncertainty as to an arrangement between the communication's sponsor and its beneficiary, it would likely still survive vagueness scrutiny.  The First Circuit upheld "on whose behalf" against vagueness attack when the phrase appeared in Rhode Island law requiring groups making independent expenditures to send notice to the candidate "'on whose behalf the expenditure . . . was made.'"  *Daluz*, 654 F.3d at 120-21 (citing R.I. Gen. Laws § 17-25-10(b)).  Even though independent expenditures were defined as spending uncoordinated with candidates, the Court found no vagueness issue with "on whose behalf." *Id.* at 118, 121.  Rather, it found the provision clearly required sending a report "to the candidate who stands to benefit from the independent expenditure's advocacy." *Id.* at 121. *McConnell* made a similar point in a different context, upholding against vagueness challenge the federal definition of coordinated expenditures, which does not require an agreement.  540 U.S. at 222-23.

requires coordination between the party benefited and the party paying for the communication, its application is relatively narrow and clearly defined.  The Court does not find it vague.

VRLC lastly contends that "relating to" in the MMA reporting requirement is vague.  The law provides that persons engaging in MMA of greater than $500 within thirty days of an election must file a report with the Secretary and send a copy to each candidate who is mentioned or whose likeness appears in the communication.  Vt. Stat. Ann. tit. 17, § 2893(b).  The required report "shall identify the person who made the expenditure with the name of the candidate involved in the activity and any other information *relating to* the expenditure that is required to be disclosed under the provisions of sections 2803(a) and (b) of this title."  *Id.* (emphasis added). Sections 2803(a) and (b) enumerate requirements for all campaign finance reports.  Moreover, they require the Secretary to provide a standard reporting form conforming to the requirements.  *Id.* § 2803(a).  The Secretary has produced a one-page, MMA-specific form, and it sets forth the information "relating to the expenditure" required to be produced.  Crossman Decl. Ex. 11.  The law is itself clear and further clarified by administrative action, and the Court does not find it unconstitutionally vague.

None of the above language "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Williams*, 553 U.S. at 304.  The Court denies VRLC's vagueness claims.

B. Overbreadth

VRLC next asks the Court to overturn the PAC, electioneering communications, and MMA provisions for First Amendment overbreadth.  A law is overbroad, and should be struck down, if "'a substantial number' of its applications are unconstitutional, 'judged in relation to the statute's plainly legitimate sweep.'"  *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 n.6 (2008) (quoting *New York v. Ferber*, 458 U.S. 747, 769-71 (1982)).  More liberal standards apply to making overbreadth claims in the free speech context than to facial vagueness claims; even if a plaintiff fails to show a law is vague as applied to any of its own speech, it retains standing to assert the law is overbroad in violation of others' free speech rights.  *See Broadrick*, 413 U.S. at 612.  In addition, a law cannot be rescued from overbreadth by the government's promises to enforce it narrowly.  *United States v. Stevens*, 130 S. Ct. 1577, 1591 (2010).  Still, the plaintiff's mere conjecture as to hypothetical cases in which the law could be applied unconstitutionally is not enough.  *Williams*, 553 U.S.

31

at 303.   Moreover, courts are reluctant to invalidate laws on
overbreadth grounds, since it is considered "strong medicine,"
to be used "sparingly and only as a last resort."  *Broadrick*,
413 U.S. at 613.

> 1.   *PAC Definition and Disclosure*

In arguing Vermont's PAC definition is overbroad, VRLC
relies on two contentions.  It contends first that PAC status is
an "onerous" burden as a matter of law, meaning any law that
triggers it must be analyzed under strict scrutiny.  Second, it
contends that the PAC definition is not properly tailored to fit
the government's interest in regulating speech, as only entities
with the "major purpose" of supporting or opposing candidates
may be defined as PACs, a limit the Vermont statute does not
reflect.

VRLC's first argument is based on the principle that PACs
are "burdensome alternatives" to direct campaign spending by
corporations or unions, *Citizens United*, 130 S. Ct. at 897-98.
It emphasizes that Vermont's PAC definition imposes a "package"
of heavy restrictions on those groups falling within its reach,
not just the disclosure requirements that are reviewed under
exacting scrutiny, *id.* at 914.  Thus, the PAC definition itself
must be rigorously reviewed without focus on the type of
regulation it may trigger, and, indeed, VRLC denies any assault
on the PAC disclosure requirements themselves.  Pls.' Summ. J.

Br. 38 n.39.[14]   Prior to *Citizens United*, the Fourth Circuit appeared to adopt a similar approach, examining North Carolina's PAC definition in light of its holistic burdens.   *NCRL III*, 525 F.3d at 286, 299-300; *but cf. Real Truth about Abortion, Inc. v. Fed. Election Comm'n*, No. 11-1760, 2012 WL 210827, at *3-5 (4th Cir. June 12, 2012) (rejecting plaintiff's request to apply strict, instead of exacting, scrutiny to review definitional language that triggered PAC disclosure and organizational requirements).

Respectfully, this Court finds the strong weight of authority post-*Citizens United*, as well as the late Judge Michael's thoughtful dissent in *NCRL III*, more persuasive in showing that it is the underlying regulation, not the PAC definition, that counts.   *McKee*, 649 F.3d at 56 (1st Cir.) ("NOM's attempt to ascribe a free-standing significance to the PAC label is unpersuasive. It is not the designation as a PAC but rather the obligations that attend PAC designation that matter for purposes of First Amendment review."); *Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1012-13 (9th Cir. 2010), *cert denied*, 131 S. Ct. 1477 (2011); *SpeechNow.org v. Fed.*

---

[14]    The implication of VRLC's approach would appear to be reviewing state PAC disclosure regulations in two stages. First, a state must enact a PAC definition that passes strict scrutiny based on the totality of the burdens it imposes and "the major purpose" test described *infra*.   Secondly, it must only place on PACs disclosure requirements that pass exacting scrutiny.   *See* Pls.' Summ. J. Br. 38 n.39.

*Election Comm'n*, 599 F.3d 686, 697 (D.C. Cir. 2010) (en banc), *cert denied sub nom.*, *Keating v. Fed. Election Comm'n*, 131 S. Ct. 553 (2010); *NCRL III*, 525 F.3d at 320 (Michael, J. dissenting); *see also Yamada*, 2012 WL 983559, at *20 (collecting further cases in support of this proposition and noting, "[t]his makes sense—the purpose of requiring registration as a noncandidate committee is transparency and to enable disclosure").

VRLC has not actually objected to the full suite of burdens it argues Vermont PACs face. While PACs are subject to a $2000 limit on contributions from an individual donor, VRLC did not join FIPE's challenge to that portion of the law and has not alleged concerns about how contribution restrictions might impact it were it deemed a PAC. While it invokes the federal law banning congressionally chartered banks and corporations and foreign nationals from making contributions, 2 U.S.C. §§ 441b, 441e, it does not show how that law burdensomely applies to it or to any other Vermont PAC. Since VRLC has not raised issue with the contribution restriction, it strikes the Court as improbable that the challenge relates to any PAC burden other than the registration and reporting disclosure requirements.[15]

---

[15]    In addition, contribution restrictions are not subject to strict scrutiny. As discussed in Part IV, *infra*, the lesser "closely drawn" scrutiny applies. *Green Party of Conn. v. Garfield*, 616 F.3d 189, 198 (2d Cir. 2010). It would thus be

As such, the Court can do no more than apply exacting
scrutiny, lest, in adopting VRLC's approach, it blur the bright
line distinction the Supreme Court has carefully maintained
between the scrutiny to apply to spending restraints and to
disclosure rules.  If Vermont law poses too onerous a burden of
compelled transparency for entities falling within the PAC
definition, the law should fail exacting scrutiny.  Otherwise,
it is constitutional as it concerns disclosure.

VRLC also argues the PAC definition fails, even under
exacting scrutiny, because it does not incorporate "the major
purpose" test to limit the groups that may be considered PACs.
The Supreme Court first articulated the major purpose test in
*Buckley*, where it reviewed federal PAC disclosure provisions
triggered when an organization made campaign expenditures or
received contributions of more than $1000.  424 U.S. at 77-79 &
n.105.  The Court was concerned that the definition of
"contribution" and "expenditure," terms that in turn defined a
political committee, were vague for using the phrase "'for the
purpose of  . . . influencing'" an election.  *Id.* at 77.  That
language made it unclear whether political committees included
"groups engaged purely in issue discussion."  *Id.* at 79.  As the
Court had already noted, there was no clear line between speech

particularly anomalous to use the presence of contribution
limits to boost review of the overall package of PAC regulations
to strict scrutiny.

centering on political issues to which a candidate may be linked and speech advocating for or against that candidate's election. *Id.* at 42.  To narrow the statute, the Court limited the law to "organizations that are under the control of a candidate or *the major purpose of which is the nomination or election of a candidate*." *Id.* at 79 (emphasis added).  On that reading, *Buckley* found, the law would only reach groups that "are, by definition, campaign related," thus placing them "within the core area sought to be addressed by Congress." *Id.*

After *Buckley*, it remained an open question whether "the major purpose" was merely a limiting construction applied to a vague federal law, or whether it was an irreducible First Amendment limit on PAC disclosure laws.  VRLC argues it is the latter, contending that Vermont's definition must include the major purpose component to prevent the law from sweeping in groups that do not engage in candidate advocacy as their major purpose.  The State would have the Court hold the former. Vermont law does not by its plain terms include the major purpose test, as it covers entities that make greater than $500 in contributions and expenditures "for the purpose of supporting or opposing one or more candidates . . . ." Vt. Stat. Ann. tit. 17, § 2801(4).

The Fourth and Tenth Circuits, in recent cases, applied the major purpose test to state laws in the manner urged by VRLC.

*NCRL III*, 525 F.3d at 288-89 ("[i]f organizations were regulable merely for having the support or opposition of a candidate as 'a major purpose,' political committee burdens could fall on organizations primarily engaged in speech on political issues unrelated to a particular candidate."); *N.M. Youth Organized v. Herrera*, 611 F.3d 669, 677-78 (10th Cir. 2010); *Colo. Right to Life Comm. v. Coffman,* 498 F.3d 1137, 1153 (10th Cir. 2007). The *NCRL III* court noted that states had the less burdensome alternative of imposing one-time disclosure in the instances in which a non-major purpose organization engaged in campaign spending, rather than requiring regular PAC reporting.  525 F.3d at 290.

   The Court is unpersuaded that the reasoning in those cases applies here.  Principally, *McConnell* made clear that the line between express and issue advocacy was a tool of statutory construction and not of independent constitutional moment.  It explained that "[i]n narrowly reading the FECA provisions in *Buckley* to avoid problems of vagueness and overbreadth, we nowhere suggested that a statute that was neither vague nor overbroad would be required to toe the same express advocacy line."  540 U.S. at 192.  It then concluded that the First Amendment does not "independent of our precedents . . . erect[] a rigid barrier between express advocacy and so-called issue advocacy."  *Id.* at 193.  *Citizens United* emphasized this point

strongly in the area of disclosure, rejecting the effort to use the functional equivalent of express advocacy test, developed in the context of electioneering spending, to mark the First Amendment boundary of the electioneering transparency provisions at issue there.  130 S. Ct. at 915.  Thus, "in light of *Citizens United* . . . the distinction between issue discussion and express advocacy has no place in First Amendment review of these sorts of disclosure-oriented laws."  *McKee*, 649 F.3d at 54-55 (applying this analysis to Maine's non-major-purpose PAC registration provisions, *id.* at 55 n.29); *see Brumsickle*, 624 F.3d at 1016 ("[I]mposing disclosure obligations on communicators engaged in issue advocacy is not per se unconstitutional; instead, the constitutionality of the obligations is determined by whether they are substantially related to a sufficiently important governmental interest.").  The major purpose limiting construction was the product of a vague statute, not of the First Amendment.

It is also for this reason that the Court disagrees with VRLC that the Second Circuit's decision in *United States v. National Committee for Impeachment*, 469 F.2d 1135 (2d Cir. 1972) governs the analysis of Vermont law and requires the major purpose test.  *National Committee for Impeachment* grappled with the same language in the federal statute prior to *Buckley* and was a source for the Supreme Court's major purpose test.  *See*

*Buckley*, 424 U.S. at 79 n.106.  The case dealt with whether a group that published a lengthy ad in the *New York Times* in support of President Nixon's impeachment and in opposition to the Vietnam War was required to register as a PAC.  469 F.2d at 1135-38.  The Court found the ad, which also praised pro-impeachment members of the U.S. House of Representatives and called for the potential creation of a pro-impeachment third party, *id.*, "[q]ualitatively, as well as quantitatively," in "support of an impeachment resolution, not the election of political candidates."  *Id.* at 1140.  It found that to regulate the sponsoring group as a PAC solely on the basis of such an ad would create "serious constitutional issues on which we express no opinion."  *Id.*  To avoid that result, it limited "'for the purpose of influencing'" with the major purpose test and found that based on the ad's focus on impeachment, the group did not meet that standard.  *Id.* at 1141.

The test put forward in *National Committee for Impeachment* was prophylactic in nature, imposed, as the Second Circuit clarified prior to *McConnell*, "[l]est any movement dealing with national policy be subjected to the onerous requirements devised to police political campaigns, a result we refused to believe Congress intended."  *Fed. Election Comm'n v. Survival Educ.*

*Fund, Inc.*, 65 F.3d 285, 294 (2d Cir. 1995).[16]  As outlined in the tailoring analysis below, Vermont's provision poses little threat of regulating beyond the election context.  Moreover, *McConnell* and *Citizens United* made clear that a concern for separating issue advocacy and express advocacy is not rooted in overbreadth but rather in vagueness.  As described *supra*, Vermont's PAC definition, as narrowed, is not unconstitutionally vague.  Indeed, the troubling "'for the purpose of . . . influencing'" language that spurred the Court in *Buckley* to impose the major purpose requirement has been functionally excised from the Vermont statute.  *Green Mountain Future*, slip op. at 12.  In the present setting, the justification for applying the major purpose test evaporates.

That conclusion is reinforced by the peculiar results that may arise in applying the major purpose test as a constitutional floor for PAC disclosure.  For instance, a group that spends $1.5 MM of a total of $6 MM on promoting candidates probably would not qualify, but one that spends $1500 of a total budget of $2000 probably would.  *See Nat'l Org. for Marriage v. McKee*, 723 F. Supp. 2d 245, 264 (D. Me. 2010), *vacated in part on other grounds*, 649 F.3d 34 (1st Cir. 2011).  A national organization

---

[16]     *Survival Education Fund* went on to state that *Buckley*'s view of "'for the purpose of influencing'" was different than *National Committee for Impeachment*'s, particularly as that language applies in the definition of "contribution."  65 F.3d at 294.

might have the major purpose of advancing candidates for state office in every state, but could avoid registering as a PAC in any particular state. *Nat'l Org. for Marriage v. McKee*, 666 F. Supp. 2d 193, 210 n.96 (D. Me. 2009).  The test also allows a group that might fit the major purpose definition on its own simply to fold itself into another, larger group that does not, evading the law's requirements. *Brumsickle*, 624 F.3d at 1012. Those outcomes emphasize that the test was merely "an artifact of the Court's construction of a federal statute." *McKee*, 649 F.3d at 59.

VRLC responds that failure by Vermont and other states to incorporate the major purpose test would create the greater perversion.  Specifically, it contends that national political advocacy organizations that do not have the major purpose of participating in any single state's candidate elections would be forced to reveal sensitive information about their activities in accordance with the requirements of the state with the broadest PAC definition and most exacting PAC disclosure laws.

Even though Vermont law does not currently incorporate the major purpose test, VRLC has provided no evidence to substantiate its concern.  More to the point, because the law defines "election" and "candidate" to include only Vermont elections and Vermont candidates, Vt. Stat. Ann. tit. 17, §§ 2801(1), (7), the Court is not troubled by the prospect that a

41

national organization would be forced to disclose to the
Secretary its non-Vermont contributions and expenditures or to
abide by Vermont's contribution limit for non-Vermont-related
contributions.  *See id.* §§ 2801(2), (3) (defining contribution
and expenditure in relation to support or opposition for
"candidates" in an "election").  In relation to a disclosure
statute that is not vague, the major purpose test has no
relevance, and Vermont was not required to incorporate it.

Having established that the frame of analysis for reviewing
the PAC provisions is the disclosure regulation they trigger and
having found the major purpose test is unnecessary, the Court
turns to its exacting scrutiny analysis.  The disclosure
required of PACs bears a substantial relation to Vermont's
sufficiently important interest in permitting Vermonters to
learn of the sources of significant influence in their state's
elections.  *See Citizens United*, 130 S. Ct. at 914.  Vermont
imposes reasonable requirements: (1) registering with the
Secretary within ten days of satisfying the dollar thresholds
for PAC status, which involves designating a treasurer and bank
account and then disclosing that information, Vt. Stat. Ann.
tit. 17, §§ 2802, 2831(a); (2) filing campaign finance reports,
at most six in an election year and one in a non-election year,
*Id.* § 2811(d); Crossman Decl. ¶ 9; (3) listing contributors of
over $100, along with their full names, addresses and dates of

contribution, *id.* § 2803(a); and (4) totaling to-date contributions and expenditures, *id.* §§ 2803(a)(2), (b). *See McKee*, 649 F.3d at 58; *Brumsickle*, 624 F.3d at 997-98, 1013.  By admission of Sharon Toborg, treasurer for VRLC, PC and FIPE, FIPE's campaign finance reports took no more than ten to fifteen minutes to complete.  Sharon Toborg Rule 30(b)(6) Dep. for FIPE, Defs.' Mot. for Summ. J. Ex. A ("FIPE Dep."), at 43-44, ECF No. 168-3.[17]

Moreover, to the extent constitutional concerns in requiring disclosure of issue advocacy remain after *Citizens United*, Vermont's PAC disclosure law does not cover a "substantial amount of non-electoral speech." *NCRL III*, 525 F.3d at 327 (Michael, J. dissenting); *see Wash. State Grange*, 552 U.S. at 450 n.6.  As narrowed by state court decision, PAC status is triggered only when an organization's contributions and expenditures to support or oppose candidates each pass the $500 threshold in a single calendar year. *Green Mountain Future*, slip op. at 12; Vt. Stat. Ann. tit. 17, § 2801(4).  In

---

[17]    The particular reports in question were from 2003 and 2008 when FIPE was assertedly inactive and had little to report. However, VRLC repeatedly made clear at oral argument that it felt the State was perfectly within First Amendment bounds to satisfy its interest in disclosure by requiring "event-driven" reports revealing a PAC's contributions and expenditures when it actively engages in campaign speech.  Thus, the limited time required to complete reports when a PAC is inactive helps demonstrate that the incremental burden of Vermont PAC status is not significant.

addition, as limited, the contribution and expenditure
definitions are tightly construed to apply only to funding
"supporting or opposing one or more candidates" or "advocating a
position on a public question." *See id.* §§ 2801(2),(3).  The
only forms of speech a PAC must report to the Secretary are
contributions and expenditures. *See id.* § 2803.  That means
PACs need only report speech that is meant to advance or defeat
the cause of a candidate or a ballot measure, not speech that
broadcasts a stance on an issue.

The statute also excludes an organization's charitable
work.  If VRLC were at some point to become a PAC, it would not
need to report, to take an example, donations received and funds
spent to support crisis pregnancy centers.  That activity would
not meet the definition of a contribution or expenditure under
Vermont law.  Since the PAC provisions neither place
unconstitutionally onerous burdens on PACs nor sweep overbroadly
to require disclosure of a substantial amount of immune speech,
the Court finds them constitutional.

2. *MMA and Electioneering Communications*

VRLC also argues the MMA and electioneering communications
disclosure provisions are overbroad.  VRLC relies on the
assumption that, as a matter of constitutional law, when states
seek to compel disclosure not connected to PAC status they may
only do so concerning two narrow types of speech: (1) express

44

advocacy; and (2) federally-defined electioneering
communications, as approved in *Citizens United*, 130 S. Ct. at
914-16.  Pls.' Summ. J. Br. 44.

VRLC's position amounts to a belief that lower courts
examining state law may only approve of mandated disclosure
provisions defined in precisely the same manner as past Supreme
Court interpretations of federal statutes.  *See* Pls.' Summ. J.
Br. 45-47.  To do otherwise, VRLC argues, would spring the traps
of vagueness or overbreadth.  *See* Pls.' Summ. J. Br. 46.  Based
on its reading of the case law, the Court disagrees.  The
Supreme Court has not implied that its reasoning on disclosure
laws was limited to finely detailed copies of the cases before
it.

Even so, the provisions upheld in *Citizens United* were
electioneering-related disclosure and identification regulations
broadly similar to Vermont's MMA and electioneering laws,
respectively.  *Compare* 130 S. Ct. at 913-14, *with* Vt. Stat. Ann.
tit. 17, §§ 2891-93.  Vermont's MMA and electioneering
provisions do go beyond the federal law's requirements in some
ways, but are narrower than the federal equivalent in others.
Examining those differences individually, the Court concludes
they do not render Vermont law overbroad.

Generally, federal law defines electioneering
communications as "any broadcast, cable, or satellite

communication" referring to a "clearly identified candidate for Federal Office" that is run within 60 days before a general or 30 days before a primary election, and that is "targeted to the relevant electorate" in congressional elections.  2 U.S.C. § 434(f)(3)(A).  Disclosure is required when the communications' sponsor spends more than $10,000 in a calendar year on them. *Id.* § 434(f)(1).  Once past the $10,000 mark, the sponsoring entity must file a report with the Federal Elections Commission within twenty-four hours to identify itself, its "custodian of the books and accounts," its principal place of business (if not an individual), the amount and source of any single disbursement over $200, the elections and names of candidates to which the communications pertain, and the names and addresses of all contributors of more than $1000 to the sponsor or a segregated bank account used by it since the start of the last calendar year.  *Id.* §§ 434(f)(1)-(2).

Vermont's MMA provisions reach more media than the federal equivalent above, including also "mass mailings, literature drops, newspaper and periodical advertisements, robotic phone calls, and telephone banks which include the name or likeness of a clearly identified candidate for office."  Vt. Stat. Ann. tit. 17, § 2893(a).[18]  Instead of the $10,000 reporting threshold,

---

[18]    VRLC does not appear to object to the expanded category of media covered by the law as compared to the federal

Vermont sets its level at $500.  *Id.* § 2893(b).  Finally, it
also requires the MMA sponsor to forward "a copy of the mass
media report to each candidate whose name or likeness is
included in the activity." *Id.*  Like the federal law, it has a
twenty-four hour notice requirement. *Id.*  In other ways,
however, the law is narrower than the federal equivalent.  For
one, it does not require reporting contributors. *Id.;* Crossman
Decl. Ex. 11.  It also only applies within the final thirty days
before a general election, rather than the sixty days in the
federal version.  Vt. Stat. Ann. tit. 17, § 2893(b).  In total,
its burdens are minimal.  The sponsor first must send the
Secretary a one-page form and then provide a photocopy of the
report to any candidates who appear in the activity. *Id.*

VRLC challenges two components of the Vermont MMA law, the
candidate notification provision and the twenty-four hour rule.
In both instances, VRLC relies on a pre-*McConnell* case that
overturned similar provisions in Colorado law. *Citizens for
Responsible Gov't State PAC v. Davidson*, 236 F.3d 1174,
1197 (10th Cir. 2000).  However, that case applied strict

---

version.  If it did, *Citizens United* would provide grounds for
skepticism of that argument, as it upheld the disclosure and
identification requirements at issue both to ten and thirty-
second television ads and to a ninety-minute film, *Hillary: The
Movie*, available only on video-on-demand service to digital
cable subscribers.  130 S. Ct. at 887, 916.  By contrast, the
media covered by Vermont's MMA and electioneering communications
provisions are more traditional channels for political
messaging. *See* Vt. Stat. Ann. tit. 17, §§ 2891, 2893.

scrutiny, while *Citizens United* makes clear that exacting scrutiny is the proper frame for review.  Applying exacting scrutiny, the First Circuit upheld an analogous candidate notification requirement for independent expenditures made on the candidate's behalf.  *Daluz*, 654 F.3d at 119 & n.6.  As there, "prompt notification to a candidate of the expenditure . . . indirectly serves the informational interest by permitting a candidate to distance herself from individuals or organizations whose views she does not share," furthering the aim of providing the public with "accurate information about electoral candidates."  *Id.* at 119.  In the same manner, it permits candidates attacked in a MMA to respond.  Moreover, the incremental burden is minor, merely requiring the sponsor to send a copy of the MMA report to the candidates mentioned.  *See id.* at 119 n.6.

The twenty-four hour rule is also properly tailored to the state's interest in allowing voters to determine the sources of campaign spending.  For one, federal law itself contains a twenty-four hour requirement.  VRLC is correct that the Supreme Court has never explicitly passed judgment on that element of the law.  Pls.' Summ. J. Br. 57 n.60.  *McConnell*, however, did uphold the law's separate requirement to report electioneering communications at the time the sponsor enters into an executory contract to produce them, if earlier than the time of broadcast.

48

540 U.S. at 200.  In sustaining that provision, the Court noted:
"Given the relatively short timeframes in which electioneering
communications are made, the interest in assuring that
disclosures are made promptly and in time to provide relevant
information to voters is unquestionably significant." *Id.*  That
reasoning applies equally here, since MMA reporting only
operates in the thirty days before an election.  *Iowa Right to
Life Comm., Inc. v. Smithson*, 750 F. Supp. 2d 1020, 1039 (S.D.
Iowa 2010) (finding Iowa's 48-hour requirement for independent
expenditures passes exacting scrutiny).  Moreover, VRLC has
offered no evidence to suggest the twenty-four hour rule would
be burdensome in its case or in general.

The same reasoning applies to Vermont's electioneering
communication identification law.  Citizens United's advertising
was subject to an identification provision.  130 S. Ct. at 913-
14.  The federal law concerns speakers that, *inter alia*, "make[]
a disbursement for the purpose of financing communications" that
expressly advocate the election or defeat of a candidate or fund
an electioneering communication.  2 U.S.C. § 441d(a).  Those
communications must "clearly state" who paid for and authorized
them, and, if not paid for or authorized by a candidate,
"clearly state" the street address, web address, and telephone
number of the person who paid for it and also state that it was
"not authorized by a candidate or candidate's committee."  *Id.*

It also specifies the size of the type, in the case of print media, or the clarity of a spoken identification statement in the case of broadcast media.  2 U.S.C. §§ 441d(c),(d).

Vermont law's electioneering communication provisions are similar.  *See* Vt. Stat. Ann. tit. 17, §§ 2891-92.  As with the MMA provision, they cover a broader array of media than the federal model, including items like billboard ads, posters, pamphlets, and robotic phone calls.  *Id.* § 2891.  While such communications must refer to "a clearly identified candidate for office," and "promote[] or support[] a candidate for that office, or attack[] or oppose[] a candidate for that office," they need not "expressly advocate[] a vote for or against a candidate."  *Id.*  Exempting single electioneers who spend no more than $150 in an election cycle, as well as lapel stickers and buttons, the law requires identification of the communication's sponsor and, if applicable, any other person on whose behalf the communication was made.  *Id.* § 2892.

VRLC argues *McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995) governs and renders Vermont's electioneering communications law unconstitutional.  In *McIntyre*, the Supreme Court rejected application of Ohio's political communications identification law to a solitary woman who distributed anonymous leaflets before a debate on a local ballot measure.  514 U.S. at 348-49, 357.  In invalidating the prior version of Vermont's

electioneering law, the Second Circuit cited *McIntyre* for the
proposition that identification requirements may be a greater
intrusion on speech than reporting requirements. *VRLC I*, 221
F.3d at 387; *see also VRCL I*, 19 F. Supp. 2d at 212 (same).
However, *Citizens United* upheld the federal disclaimer provision
without so much as mentioning *McIntyre*, noting that while
disclaimer provisions "burden the ability to speak," they do not
limit speech.  130 S. Ct. at 914; *see also McKee*, 649 F.3d at 61
("'*Citizens United* has effectively disposed of any attack on
Maine's attribution and disclaimer requirements.'")(quoting
*McKee*, 723 F. Supp. 2d at 267)).  VRLC does not make clear why
*McIntyre* requires this Court to hold Vermont law
unconstitutional but did not even merit a citation in the
analogous context in *Citizens United*.

    In addition, the Court in *McIntyre* effectively applied
strict scrutiny to the Ohio law.  *Justice v. Hosemann*, 829 F.
Supp. 2d 504, 514 (N.D. Miss. 2011); *see McIntyre*, 514 U.S. at
337 ("we uphold the restriction only if it is narrowly tailored
to serve an overriding state interest").  That test is at odds
with the version of exacting scrutiny the Court applied in
*Citizens United*.  *See Brumsickle*, 624 F.3d at 1013 (noting that
*Citizens United* overruled prior Ninth Circuit precedent that
applied strict scrutiny to disclosure laws).  Supreme Court case
law since this Court and the Second Circuit decided *VRLC I* make

it clear that *McIntyre* is inapposite to the class of restrictions at issue.

VRLC also contends that the "on whose behalf" requirement creates a further burden, requiring speakers to place the name of the beneficiary party on the communication itself, which it argues will confuse viewers into believing issue messages are election-related.  That fear is unfounded because, as discussed in Part III.A.2, *supra*, "on whose behalf" requires agreement from the beneficiary to produce the message.  The Court does not find the prospect of placing an additional name on the communication constitutionally significant.  On the contrary, the federal statute, unlike Vermont's, requires publication of the communication sponsor's web address and telephone number, and it also mandates that the message state that it "was not authorized by a candidate or candidate's committee."  2 U.S.C. § 441d(a).  Those enforced disclosures are, if anything, more burdensome than Vermont's, even when the "on whose behalf" sentence is implicated.  Nor does the Court accept, without further justification, that the minimal identification statements required by Vermont law will distract or mislead viewers.  *See McKee*, 649 F.3d at 61.

The identification law promotes the substantial state interest in increasing the transparency of the sources of candidate support.  *See id*.  The burden on speakers to comply

52

with the law is minimal, and Vermont further limits the impact
of the regulation by exempting small-scale electioneering items—
lapel stickers and buttons—and individual electioneers who spend
less than $150 in an election cycle.  Vt. Stat. Ann. tit. 17, §
2892.[19]

In sum and substance, Vermont's MMA and electioneering
communications provisions are similar to those upheld and
applied in *Citizens United*.  Like the PAC disclosure rules, they
bear a substantial relation to Vermont's sufficiently important
interest in permitting citizens to gauge the sources of
candidate support, and they pass exacting scrutiny.  As such,
the Court finds they are not overbroad.

### C. $100 Transparency Threshold for PAC Contributors

The final disclosure challenge is brought by FIPE to the
contribution threshold of $100, above which PACs must disclose a
donor's name, address and date of contribution.  Vt. Stat. Ann.
tit. 17, § 2803(a)(1).  The *Buckley* Court affirmed a similar
$100 standard, noting that setting the disclosure threshold was
an evaluation best left to congressional discretion and that
"[w]e cannot say, on this bare record, that the limits
designated are wholly without rationality."  424 U.S. at 83.

---

[19]    Since the electioneering communications definition is
not vague, the Court rejects VRLC's assertion that the
electioneering communications identification provision is
unconstitutional by virtue of implementing unconstitutional
definitional language.  *See* Pls.' Summ. J. Br. 14.

The First Circuit recently applied the same "wholly without rationality" standard to uphold Rhode Island's $100 independent expenditure reporting threshold. *Daluz*, 654 F.3d at 118-19. The Court applies that same standard to Vermont law and disagrees with VRLC that exacting scrutiny should instead apply. Even if exacting scrutiny were appropriate, however, it would make little difference in the Court's analysis of this disclosure threshold. *See Family PAC v. McKenna*, Nos. 10-35832, 10-35893, 2012 WL 266111, at *6 & n.7 (9th Cir. Jan. 31, 2012) (applying exacting scrutiny to uphold $25 and $100 thresholds, noting "[i]t is far from clear, however, that even a zero-dollar disclosure threshold would succumb to exacting scrutiny" and that "we are not aware of any decision invalidating a *contribution disclosure requirement*, either facially or as applied to a particular actor").

Vermont's $100 level has a rational foundation.  It is higher than twenty-eight states' and the District of Columbia's. Report of Robert Stern, Defs.' Mot. for Summ. J. Ex CC ("Stern Report"), at 8, ECF No. 168-32.  In fact, Alaska, Louisiana, Michigan, and New Mexico require disclosure of all contributions to PACs.  Stern Report 8.  Only five states and the federal government set their thresholds above Vermont's.  Stern Report 8; *see also ProtectMarriage.com v. Bowen*, 599 F. Supp. 2d 1197, 1221 (E.D. Cal. 2009) ("California's current $100 threshold

54

falls well within spectrum of those mandated by its sister
states, which range from no threshold requirement to $300.").
Nor has Vermont arrived at $100 haphazardly: the legislative
history reflects a concerted effort to adjust the amount over
the years.[20]   The present level appears well-calculated for
transparency without being overly burdensome.   Based on a review
of 2006 and 2008 campaign data in Vermont, the $100 level
permits transparency for 80 percent of PAC contributions,
compared to only 40 percent under a hypothetical $500 threshold.
Decl. of Michael Franz ¶ 22, Defs.' Mot. for Summ. J., ECF No.
71-47.

VRLC additionally argues the $100 threshold is set too low
because it is not adjusted for inflation.   While the Supreme
Court in *Randall*, 548 U.S. at 261, found that Vermont's failure
to index its candidate contribution limits to inflation was one
factor making them unconstitutionally low, failure to index
contribution limits to inflation alone is not enough to justify
invalidating them.   *Ognibene v. Parkes*, 671 F.3d 174, 192 (2d
Cir. 2011).   Failure to index is far less a concern in the realm
of disclosure thresholds.   *See McKee*, 649 F.3d at 60-61

---

[20]     1971 Vt. Acts & Resolves 541, Defs.' Mot. for Summ.
J. Ex. 5, at 3, ECF 71-7 ($100); 1975 Vt. Acts & Resolves 187,
Defs.' Mot. for Summ. J. Ex. 6, at 3, ECF No. 71-8 ($25); 1982
Vt. Acts & Resolves 288, Defs.' Mot. for Summ. J. Ex. 8, at 3,
ECF No. 71-10 ($50); 1988 Vt. Acts & Resolves 456, Defs.' Mot.
for Summ. J. Ex. 12, at 4, ECF No. 71-12 ($100).

("Neither we nor the Supreme Court has ever second-guessed a legislative decision not to index a reporting requirement to inflation."). Examined under a "wholly without rationality" review, Vermont's $100 contribution disclosure provision is constitutional.

Thus, the Court denies in full Plaintiffs' constitutional challenges to Vermont's campaign finance disclosure laws. It now turns to the one remaining claim, FIPE's as-applied challenge to Vermont's single source contribution limit.

## IV.  $2000 Limit on Contributions to PACs

Vermont requires that "[a] political committee . . . shall not accept contributions totaling more than $2,000.00 from a single source, political committee or political party in any two-year general election cycle." Vt. Stat. Ann. tit. 17, § 2805(a). FIPE challenges Section 2805(a) as it applies to it, a PAC that assertedly makes only independent expenditures. FIPE argues that since the contributions it receives go only to independent expenditures, and are not contributed to or coordinated with candidates, Vermont has no valid state interest in limiting the contributions FIPE may receive from individual donors. The State argues that it is justified in imposing the limit in Section 2805(a) on independent-expenditure-only groups, but that, in any event, the restriction is constitutional as

56

applied to FIPE, since FIPE in reality merges thoroughly with PC, the VRLC fund that makes candidate contributions.

A. State Interests in Limiting Contributions

Limits on contributions must be "closely drawn to achieve a 'sufficiently important' government interest." *Green Party of Conn.,* 616 F.3d at 199 (quoting *Fed. Election Comm'n v. Beaumont*, 539 U.S. 146, 162 (2003)). This distinguishes them from limits on expenditures, which are subject to strict scrutiny. *Green Party of Conn.*, 616 F.3d at 198-99. Scrutiny of contribution restrictions is "relatively complaisant . . . because contributions lie closer to the edges than to the core of political expression." *Beaumont*, 539 U.S. at 161. The Supreme Court has adhered generally to "this line between contributing and spending." *Fed. Election Comm'n v. Colo. Republican Fed. Campaign Comm. (Colorado Republican II)*, 533 U.S. 431, 437 (2001).

At least two state interests may support contribution limits.[21] First is the appearance or reality of *quid-pro-quo*

_____

[21]    In *Ognibene,* the Second Circuit left open whether the additional interests in preventing the distortionary impact of corporate involvement in election politics and in protecting shareholders who disagree with the corporation's political beliefs might supply valid grounds for restricting corporate contributions, even though *Citizens United* had rejected them in the context of expenditure limits.  671 F.3d at 194-95 & n.21; *see Citizens United*, 130 S. Ct. at 909 (refusing to revisit *Fed. Election Comm'n v. Nat'l Right to Work Comm.*, 459 U.S. 197, 207-08 (1982)), which relied on those rationales to sustain limits

corruption in the relationship between a contributor and a candidate. *Ognibene*, 671 F.3d at 194. As the Supreme Court expressed: "[w]hile neither law nor morals equate all political contributions, without more, with bribes," there is a perception of corruption "'inherent in a regime of large individual financial contributions' to candidates for public office." *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 390 (2000) (quoting *Buckley*, 424 U.S. at 27). Accordingly, since *Citizens United*, the Second Circuit has upheld total bans on contributions from current and prospective state contractors to Connecticut candidates, *Green Party of Conn.*, 616 F.3d at 202, and by all corporations and other business organizations to office seekers in New York City, *Ognibene*, 671 F.3d at 194-97. The same rationale applies to support limits on the amount donors may contribute to a PAC that in turn contributes to or coordinates its spending with candidates. *Landell*, 382 F.3d at 140-41; *see Buckley*, 424 U.S. at 23-26.

Second, and conceptually related, is the state interest in preventing the circumvention of valid contribution limits, which itself forestalls the reality and appearance of *quid-pro-quo* corruption. *Ognibene*, 671 F.3d at 195 & n.21 (clarifying that the anti-circumvention interest survives *Citizens United*); *see*

---

on corporations' soliciting funds for their segregated PACs). As in *Ognibene*, it is not necessary to rely on them here.

*also Green Party of Conn.*, 616 F.3d at 203-04 (upholding a ban
on contributions by state contractors' spouses and dependent
children to Connecticut candidates under an anti-circumvention
rationale).  States are permitted to address the "hard lesson"
that contributors, once stymied from swaying candidates unduly
by direct means, might render contribution limits irrelevant "by
scrambling to find another way to purchase influence."
*McConnell*, 540 U.S. at 165.  In *California Medical Association
v. Federal Election Commission* (*Cal-Med*), 453 U.S. 182 (1981),
the Supreme Court upheld the federal limit on contributions to
PACs that in turn contribute to candidates, called
"multicandidate committees."  Justice Marshall's plurality
opinion reasoned that Congress's decision to limit those
contributions was justified because, otherwise, donors would
circumvent limits on their own contributions to candidates by
funneling unlimited funds through political committees.  *Id.* at
198-99.  Bearing those principles in mind, the Court turns to
the parties' arguments.

    B. <u>Limits on Contributions to FIPE Regardless of the
       Nature of its Campaign Spending</u>

    The State first argues it may regulate the amount in
contributions FIPE may receive from single sources even if FIPE
engages in only independent expenditures.  The Supreme Court has
found that independent expenditures do not raise concerns of the

reality or appearance of corruption, since their very separation from candidates ensures "[t]he candidate-funding circuit is broken." *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2826-27 (2011).  Federal courts to address the issue since *Citizens United* have emphasized that because independent expenditures cannot corrupt, governments have no valid anti-corruption interest in limiting contributions to independent-expenditure-only groups.  *See SpeechNow.org*, 599 F.3d at 694-95; *Wis. Right to Life State Political Action Comm. v. Barland*, 664 F.3d 139, 154 (7th Cir. 2011); *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1118-21 (9th Cir. 2011); *see also NCRL III*, 525 F.3d at 295 (holding same pre-*Citizens United*).  Thus, they have sustained as-applied challenges to those limits by groups making solely independent expenditures.

These cases are in accord with the view expressed by Justice Blackmun in his concurring opinion in *Cal-Med*, in which he joined the plurality in upholding the limit on contributions the multi-candidate committee there could receive from donors. 453 U.S. at 201-04.  He wrote separately to clarify that, in his view, the outcome would have been different had the limit been applied to "contributions to a committee that makes only independent expenditures." *Id.* at 203.  In that instance, he noted, there would be no threat of corruption. *Id.*  The Second Circuit has not had occasion to comment on the rationale Justice

Blackmun and other courts of appeals have relied upon, but to date, the full weight of authority lines up against regulating contributions to independent-expenditure-only groups. As such, the State's burden in justifying contribution limits on independent-expenditure-only groups is considerable. *See Shrink Mo. Gov't PAC,* 528 U.S. at 391 ("The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised.").

Against that backdrop, the State responds first by asserting that Vermont has a unique record of corruption and the appearance of corruption, caused in part by independent expenditure groups, which justifies extending a contribution limit to all PACs. Defs.' Summ. J. Br. 66-72. The State marshals legislative history and witness declarations in support of its argument, but its approach appears to be foreclosed by *Citizens United*.

In the wake of *Citizens United*, the Montana Supreme Court upheld Montana's prohibition on all corporate spending to support or oppose political candidates, including independent expenditures, distinguishing the case from *Citizens United* on the basis of Montana's long history of corporate corruption and its less-onerous PAC alternative. *W. Tradition P'ship v. Attorney Gen.,* 2011 MT 328, 363 Mont. 220 (2011). The U.S.

Supreme Court has since stayed that ruling pending a decision on whether to grant a writ of certiorari. *Am. Tradition P'ship, Inc. v. Bullock*, 132 S. Ct. 1307 (2012). Justice Ginsburg, in a statement attached to the stay order that Justice Breyer joined, noted that "Montana's experience, and experience elsewhere since this Court's decision in *Citizens United . . .* make it exceedingly difficult to maintain that independent expenditures by corporations do not give rise to corruption or the appearance of corruption." *Id.* at 1308 (internal quotation and citation omitted). Even so, Justice Ginsburg concluded the Montana decision was squarely at odds with *Citizens United*, voting to grant the stay because "lower courts are bound to follow this Court's decisions until they are withdrawn or modified." *Id.*

The stay is strong evidence that, at least until the Supreme Court says otherwise, arguments based on peculiar state context cannot unseat the general finding that independent expenditures do not corrupt.[22] As Judge Aspen of the Northern District of Illinois recently put it: "even in Illinois, independent expenditures do not lead to corruption." *Personal PAC v. McGuffage*, No. 12-cv-1043, 2012 WL 850744, at *4 (N.D. Ill. Mar. 13, 2012).

---

[22]    Further still, the record does not make clear "that corruption (or its appearance) in Vermont is significantly more serious a matter than elsewhere." *Randall*, 548 U.S. at 261.

The State also contends the limit may be justified against independent-expenditure-only groups as a means to facilitate transparency of the activities of large campaign spenders. Defs.' Summ. J. Br. 73.  Wealthy donors would be encouraged by the absence of independent expenditure PAC contribution limits to funnel contributions to PACs rather than spend money themselves on electioneering communications.  The upshot, according to the State, will be that the donors' spending would be more difficult to trace than were it revealed by electioneering communications attribution.  This argument gives short shrift to the PAC reporting requirements the Court upholds today.  FIPE, like any other Vermont PAC, must reveal every contributor who has provided it with more than $100, Vt. Stat. Ann. tit. 17, § 2803(a)(1), which is a more direct and less burdensome means to address the State's transparency concern. *See Citizens Against Rent Control/Coal. for Fair Housing v. City of Berkeley*, 454 U.S. 290, 298-99 (1981).  The State's arguments do not provide grounds to doubt the broadly-held view that states may not limit contributions independent-expenditure-only groups receive from single sources.

> C. Limits on Contributions to FIPE because of its
>    Relationship with PC

Since FIPE maintains it makes only independent expenditures, it insists that this must be the end of the

Court's analysis.  The State counters that the undisputed record before the Court leads to the opposite conclusion: that FIPE in fact is enmeshed completely with PC, which contributes funds to candidates, and thus cannot be considered to make independent expenditures.  FIPE has chosen not to take the fallback position of contesting the factual showing the State has made to prove its point.  FIPE's view is that its status is cemented as a matter of law.  *See NCRL III*, 525 F.3d at 294 n.8 (declining state's request to "pierce the corporate veil," since "while NCRL-FIPE does share staff and facilities with its sister and parent entities, it is independent as a matter of law" and the state presented no evidence that it was abusing its corporate form).

The Court is mindful of the delicacy of inquiring into this sensitive area of First Amendment liberty, and it does not question FIPE's good faith and candor.  However, it declines to accept FIPE as an independent-expenditure-only PAC without resort to the factual record.  To begin, the Second Circuit ordered this Court to make "findings" as to whether FIPE "makes solely independent expenditures" and has standing to bring its claim, when FIPE raised the very same challenge to Vermont's contribution limit in *Landell*.  382 F.3d at 144.[23]  That

---

[23]     On review of the factual record, the Court finds no reason to question FIPE's standing to bring this challenge as an

statement demonstrates the Second Circuit's view that the factual basis for FIPE's assertion was crucial.  The parties subsequently agreed to dismiss FIPE's claim without prejudice, making any inquiry moot on remand in *Landell*.  *See* Final Judgment Order 2, No. 2:99-cv-146.  However, the same reasoning controls the Court's analysis in this case, involving the same challenge raised by the same plaintiff.

Even if it were not directed to do so by the Second Circuit, the Court would take the same course.  In this as-applied challenge, the facts are vital.  *See Colo. Republican Fed. Campaign Comm. v. Fed. Election Comm'n*, 518 U.S. 604, 613-14, 619 (1996) (examining the summary judgment factual record to determine whether a political party's advertisement was an expenditure that was coordinated with a candidate, and, in light of the undisputed record to the contrary, rejecting the government's assertion as a matter of law that it was coordinated).  The issue of independence from candidates is the touchstone of the contribution limit's constitutionality.  A

---

entity that makes independent expenditures and hopes to receive contributions in excess of $2000.  The trouble, as discussed *infra*, is the lack of clear accounting between it and PC, making it uncertain which money supports which activities of the two entities.  The Court does not believe the Second Circuit would have wished it to have viewed the facts for the purposes of a standing inquiry only to put on a blindfold when reaching the merits of FIPE's claims.  For that reason, the Court also examines the factual record as to the State's rationale for applying Section 2805(a) to FIPE.

number of the courts that have struck down limits on
contributions applied to independent-expenditure-only PACs have
made clear their reasoning would not hold to the extent the
assumption of independence were undermined. *Wis. Right to Life
State PAC*, 664 F.3d at 155 (If a PAC "is not truly independent .
. . . the committee would not qualify for the free-speech safe
harbor for independent expenditures."); *Long Beach Area Chamber
of Commerce v. City of Long Beach,* 603 F.3d 684, 696-97 (9th
Cir. 2010), *cert. denied*, 131 S. Ct. 392 (2010) (examining the
evidentiary record and finding it revealed only attenuated ties
between the independent-expenditure-only PAC and candidates);
*SpeechNow.org*, 599 F.3d at 696 (deciding "these questions as
applied to contributions to SpeechNow, an independent
expenditure-only group" that had yet to begin operations); *NCRL
III*, 525 F.3d at 295 ("If independent expenditure committees are
not in fact independent, they risk forfeiting their exemption
from North Carolina's contribution limits."); *Yamada*, 2012 WL
983559, at *15 ("The record contains no evidence contradicting
AFA-PAC's assertion that it 'operates like any other independent
political action committee.'"). Unlike in those cases, here the
State has compiled a factual record to contradict FIPE's claim.

FIPE too takes seriously the concern that independent
expenditure groups could use their privileged status as a cloak
for non-independent spending. At oral argument, it offered that

the State could, in the future, probe FIPE's fidelity to that
status in the context of an enforcement action.  It admitted in
its briefing that an organization that engaged in some speech
apart from independent expenditures "would present harder
questions."  Pls.' Summ. J. Br. 60 n.63.  FIPE is correct that
the details of its activities could change the First Amendment
calculus.  The Second Circuit made clear that Vermont's
contribution limit, when applied to groups like PC that
contribute to or coordinate spending with candidates, is
"unquestionably constitutional."  *Landell*, 382 F.3d at 140.  The
D.C. Circuit held that when a PAC engages in more than just
independent expenditures, it may be subject to contribution
limits for its non-independent spending.  *Emily's List v. Fed.
Election Comm'n*, 581 F.3d 1, 12 (D.C. Cir. 2009).

Finally, in examining FIPE, the Court is guided by the type
of burden on speech at issue.  This is not a case in which
Vermont has imposed a limit on FIPE's expenditures.  Instead, it
has reduced the amount FIPE can collect from individual
contributors that it might later convert into its own speech.
*See Buckley*, 424 U.S. at 20-21.  Thus, while the Court is deeply
sensitive to the hardship that would be imposed in upholding
total bans on independent speech while parsing them in endless
as-applied review, *see WRTL II*, 551 U.S. at 468 n.5, 469, 474-
76; *Citizens United*, 130 S. Ct. at 891, 895, that concern

applies with less vigor in the context of a limit on large, single-source contributions to PACs.  Moreover, the factual record to be explored below was compiled in expedited discovery and, had circumstances not intervened, would have been the subject of a decision in a fast-tracked proceeding several years ago.

To sum up, the character of FIPE's political involvement is the hinge on which its claim pivots.  To rely solely on a PAC's assertions as to that decisive point, even when challenged by state parties' uncontested facts at summary judgment, would grant "an explicit green light . . . to circumvent campaign finance regulation."  *See NCRL III*, 525 F.3d at 337 (Michael, J. dissenting).

> D. The Undisputed Factual Record and its Implications for FIPE

In light of those considerations, the Court now turns to the factual record as to FIPE's status, which FIPE does not contest.  Since FIPE repeatedly conceded any challenge on the facts, the record before the Court is essentially limited to the fruits of the State's discovery.

VRLC formed FIPE in 1999 for "the sole purpose of making independent expenditures in Vermont state elections." Organizational Docs. 3.  It noted FIPE would not "make monetary or in-kind contributions to candidates and it will not

coordinate" with candidates.  Organizational Docs. 3.  FIPE and
PC each maintain distinct bank accounts.  However, Kevin
Marchand, an accountant who examined VRLC's, FIPE's, and PC's
structure and finances for the State, found that FIPE is managed
by VRLC and has no formal existence apart from VRLC.  *See* Decl.
of Kevin Marchand, CPA, Defs.' Resp. in Opp'n to Pls.' Mot. for
Summ. J. Ex. 7 ("Marchand Decl.") ¶ 9, ECF No. 93-10.  FIPE and
PC are not separately incorporated organizations.  Marchand
Decl. ¶¶ 9, 10.  In addition to that lack of formal separation,
"[t]here is a permeable membrane, rather than a fixed boundary,
between VRLC and its funds."  Marchand Decl. ¶ 29.  Moreover,
"it is difficult to determine which fund is supporting which
activity of VRLC."  Marchand Decl. ¶ 36.

The record demonstrates that FIPE and PC are particularly
interrelated.  According to Marchand, "[t]here is a fluidity of
funds between VRLC-FIPE and VRLC-PC."  Marchand Decl. ¶ 11.
VRLC at times transfers funds from PC to FIPE if FIPE cannot
afford to engage in an activity on its own.  *Id.*  FIPE and PC
together produce, and pay for, voter guides describing the pro-
life positions of candidates in each county in Vermont.  FIPE
Dep. 28-31.  From the Court's review of the record, this appears
to be FIPE's primary activity.  FIPE and PC often list
themselves together as sponsors on the backs of those guides.
*See* Voter Guides, Defs.' Mot. for Summ. J. Ex. D ("Voter

Guides"), ECF No. 168-6.  This practice continued even in 2004
and 2006, election cycles during which FIPE stated it was
inactive.  Voter Guides 2-16.  The only criteria in determining
whether FIPE or PC money is used to pay for a particular guide
is how much money each fund has available and whether the
publication refers to a federal candidate, in which case PC
funds are used.  FIPE Dep. 31.  PC also bases its endorsement
decisions on the voter guides, while FIPE has sent postcards to
supporters describing candidates PC has endorsed.  *See* FIPE Dep.
36-37.

FIPE and PC have separate committees that direct their
activities, but those committees overlap almost entirely in
membership, meet at the same time and same place, and sometimes
refer to FIPE and PC interchangeably.  FIPE Dep. 7-8.  In a 2008
PC committee meeting, the members described that they had a goal
of raising $10,000 in combined FIPE and PC funds and one member
suggested sending a FIPE letter to non-members and businesses,
which PC is not permitted to solicit.  PC Comm. Meeting Minutes,
Defs.' Mot. for Summ. J. Ex. Y ("PC Minutes"), at 18, 21, ECF
No. 168-41.  They make decisions on whether to use FIPE or PC,
such as in the 2010 election, based on strategic concerns.  *See*
PC Minutes 3 ("Sharon raised the probability that we would use
the FIPE predominantly in this coming election, as opposed to

70

PC, since we are unlikely to be active in any federal races and since the FIPE can raise funds that the PC can't.")

Mary Hahn Beerworth, the Executive Director of VRLC, is an *ex officio* member of FIPE's committee, VRLC Board Meeting Minutes, Defs.' Mot. for Summ. J. Ex. AA, at 22, ECF No. 168-43. She also attends FIPE and PC committee meetings and advises both committees.  Mary Hahn Beerworth Dep., Defs.' Mot. for Summ. J. Ex. Q ("Beerworth Dep."), at 4-6, ECF No. 168-20.  Ms. Beerworth, as part of her work for VRLC, meets with potential candidates to encourage them to run for elected office. Beerworth Dep. 4; PC Minutes 38.  Ms. Beerworth, along with Michele Morin,[24] decides whether to provide candidates VRLC endorses with access to the organization's supporter phone and mailing list, either by the candidate purchasing a portion of the list from VRLC or by an in-kind contribution from PC to the candidate.  Morin Dep. 14-15; Beerworth Dep. 16-17.  She also lobbies elected officials on behalf of VRLC.  Beerworth Dep. 3.

During the 2010 campaign, Ms. Beerworth advised Brian Dubie, the Republican candidate for Governor, and members of his campaign staff on pro-life issues.  *See* Mary Hahn Beerworth E-mail Correspondence, Defs.' Mot. for Summ. J. Ex. K, ECF No. 168-14.  During that time, FIPE was active and sought to raise

---

[24]    Ms. Morin is the chair of the PC committee and a member of the FIPE committee.  Michele H. Morin Dep., Defs.' Mot. for Summ. J. Ex. T ("Morin Dep."), at 3, ECF No. 168-23.

money from contributors who had "maxed out" on contributions to
Mr. Dubie's gubernatorial campaign.  FIPE Comm. Meeting Minutes,
Defs.' Mot. for Summ. J. Ex. Z, at 4, ECF No. 168-42.  During
the same cycle, the Dubie campaign accepted over $900 worth of
VRLC's supporter phone lists as an in-kind contribution.  2010
Brian Dubie Campaign Finance Disclosure Forms, Defs.' Mot. for
Summ. J. Ex. GG, at 4, 7, ECF No. 168-36.  PC has endorsed Dubie
in every election in which he has run.  Beerworth Dep. 22-23.

       Based on those facts, the Court concludes that the
structural melding between FIPE and PC leaves no significant
functional divide between them for the purposes of campaign
finance law.  Their nearly complete organizational identity
poses serious questions in its own right.  *See NCRL III*, 525
F.3d at 337 (Michael, *J.* dissenting) ("It is hard to understand
how NCRL-FIPE could, whether intentionally or not, avoid
incorporating the coordinated campaign strategies used by NCRL-
PAC into its own ostensibly independent campaign work.").  That
concern appears starkly in how FIPE and PC operated during the
2010 campaign.  Ms. Beerworth, who was involved in setting
FIPE's direction as a member of its committee, also actively
advised the Brian Dubie campaign, and was involved in VRLC and
PC which endorsed Mr. Dubie and contributed supporter phone

numbers to his campaign.[25]  It is underscored in the consolidated manner in which FIPE and PC approach creating and funding the voter guides.  The record indicates that FIPE works part and parcel with PC, with minimal distinctions observed between the two.

FIPE responds to that suggestion with language taken from prior cases that it suggests hold as a matter of law that PACs formed by a corporation must be treated as distinct entities. In *Cal-Med*, the Supreme Court held that the multicandidate committee at issue was "a separate legal entity" from the California Medical Association ("CMA") that created it.  453 U.S. at 196.  However, it did so only to state that limiting the contributions CMA could make to its multicandidate committee was not "an unconstitutional expenditure limitation because it restricts the ability of CMA to engage in political speech through a political committee."  *Id.* at 195-96; *see Buckley*, 424

---

[25]    The Supreme Court in *McConnell* traced the constitutional boundaries of coordinated expenditure regulation, stating: "We are not persuaded that the presence of an agreement marks the dividing line between expenditures that are coordinated—and therefore may be regulated as indirect contributions—and expenditures that truly are independent."  540 U.S. at 221.  "[E]xpenditures made after a 'wink or nod' often will be 'as useful to the candidate as cash.'"  *Id.* (quoting *Colorado Republican II*, 533 U.S. at 442, 446).  As previously noted, however, Vermont law, by virtue of "on whose behalf," contemplates express and intentional coordination between the candidate and the spender before an expenditure is considered "coordinated."  *See* Vt. Stat. Ann. tit. 17, § 2809(c).  The record does not evidence any expenditures designated as FIPE's that were undertaken at the Dubie campaign's explicit direction.

U.S. at 21 ("the transformation of contributions into political debate involves speech by someone other than the contributor"). Nor does *Citizens United* counsel differently, where, as previously described, the Supreme Court held that the First Amendment infringement in banning corporate independent expenditures was not cured by a PAC alternative, since PACs cannot substitute for the corporation's own speech. *See* 130 S. Ct. at 897. Neither case stands for the proposition that Vermont PACs must be treated as wholly distinct entities as a matter of law when reviewing limits on contributions they may receive.

Nonetheless, on its own, it is unclear whether even a complete overlap in staff and symmetry in spending permit extending contribution limits that undisputedly apply to a PAC that makes candidate contributions to one that does independent expenditures. The D.C. Circuit held that a *single* "non-profit that makes expenditures to support federal candidates does not suddenly forfeit its First Amendment rights when it decides also to make direct contributions to parties or candidates." *Emily's List*, 581 F.3d at 12. It "simply must ensure, to avoid circumvention of individual contribution limits by its donors, that its contributions to parties or candidates come from" an account containing funds raised in accordance with contribution limits, while it may spend freely from funds raised in unlimited

quantities when it engages in independent expenditures.  *Id.*  If a PAC complies with that protocol, the D.C. Circuit held, the federal government cannot apply a blanket contribution limit to all its fundraising.  *Id.; see also Thalheimer v. City of San Diego*, 09-CV-2862-IEG BGS, 2012 WL 177414, at *13 (S.D. Cal. Jan. 20, 2012) (relying on *Emily's List* to reject application of San Diego's limit on contributions to political committees to the extent those political committees engage in independent expenditures, regardless of whether they also conduct non-independent spending).  Relying on *Emily's List*, the U.S. District Court for the District of Columbia held that maintaining segregated bank accounts is sufficient to ensure a division between funds raised by a federal political committee for independent expenditures and those raised by the same organization for candidate contributions.  *Carey v. Fed. Election Comm'n*, 791 F. Supp. 2d 121, 131-32 (D.D.C. 2011).

The Court states that this point of law is "unclear" because, as the D.C. Circuit acknowledged, it is in tension with language in *McConnell.  See Emily's List*, 581 F.3d at 163 n.13. In a footnote, the principal opinion in *McConnell* read *Buckley* and *Cal-Med* to approve of contribution limits on political committees both insofar as they restrict the "amount of funds available to parties and political committees to make candidate contributions," and when they also apply to limit the "amount of

75

funds available to engage in express advocacy and numerous other noncoordinated expenditures." 540 U.S. at 152 n.48. Thus, by its express language, the Supreme Court seemed to refute the assumption that generalized limits on contributions to groups that engage in both independent expenditures and coordinated spending are unconstitutional. *See NCRL III*, 525 F.3d at 333 (Michael, J. dissenting); *Emily's List*, 581 F.3d at 37-38 (Brown, J. concurring in part). The majority in *Emily's List* gave the *McConnell* footnote a narrow reading by finding it could only have been meant to make a point about political parties, the principal concern of that portion of *McConnell*, rather than about PACs, the subject of the cited portions of *Cal Med* and *Buckley*. *See* 581 F.3d at 163 n.13. For the reason described below, the Court need only note, and not interject itself into this interpretive debate.

The critical distinction between *Emily's List* and *Carey* and the case at bar is that the functional similarity of PC and FIPE is coupled with "a fluidity of funds." Marchand Decl., ¶ 11. Without a clear accounting between dollars spent by each fund, it cannot be maintained that contributions to FIPE, intended for independent expenditures, are truly aimed at that purpose when spent. *See Carey*, 791 F. Supp. 2d at 132. With little demarcation between PC, a fund that gives contributions to candidates, and FIPE, the State is justified under the anti-

circumvention rationale in also limiting contributions from single sources to FIPE.  Otherwise, funds raised in unlimited quantities by FIPE may support coordinated spending or candidate contributions.  Thus, PC would be able to circumvent limits on contributions to it to support its activities.  It would also provide an outlet for unlimited contributions from donors otherwise subject to valid limits on direct contributions to candidates.  *See* Crossman Decl. ¶ 35 (Vermont candidates may only accept $1000 in contributions from individuals).

"*Buckley* demonstrates that the dangers of large, corrupt contributions and the suspicion that large contributions are corrupt are neither novel nor implausible." *Shrink Mo. Gov't PAC*, 528 U.S. at 391; *cf. Colorado Republican II*, 533 U.S. at 464-65 ("Therefore the choice here is not, as in *Buckley* and *Colorado I*, between a limit on pure contributions and pure expenditures.  The choice is between limiting contributions and limiting expenditures whose special value as expenditures is also the source of their power to corrupt. Congress is entitled to its choice.").  Faced with that risk, the State may apply Section 2805(a) to FIPE.

The Court emphasizes that it reaches this decision in part based on the category of restriction on speech at issue. Vermont neither limits the aggregate amount FIPE may collect from its supporters, nor the amount FIPE may spend.  Nor does

77

the Court hold today that FIPE is categorically required to submit to Section 2805(a) should it change its accounting practices.  It reiterates that the State has not offered a persuasive basis on which to limit contributions to PACs that only make independent expenditures.  However, the Court cannot ignore the undisputed factual record before it.  As applied to FIPE, Vermont is permitted to enforce Section 2805(a) to avert opening a loophole through which contributors may provide FIPE with unlimited sums to contribute to candidates through the flow of funds between FIPE and PC.

### Conclusion & Order

Vermont has striven for over a century to curb the worst influences of money in its politics, pursuing the state constitutional mandate "That all elections ought to be free and without corruption," Vt. Const. ch. 1, art. 8.  The laws at issue in this case have already been honed by legislative initiatives and legal challenges, but safeguarding the precious First Amendment protection of political speech in keeping with our republic's bold experiment in government "of the people, by the people, for the people" will doubtless remain the subject of debate.

The Supreme Court's profound expression of the law in this area, *Citizens United*, is best known in the public discourse for overruling precedent that had allowed governments to ban

corporate independent expenditures in political campaigns. That aspect of the decision has since reduced constraints on corporate political spending. Less discussed is that a near-unanimous Court in *Citizens United* also affirmed the line of cases permitting governments to require political speakers to identify themselves on their communications and to disclose their basic organizational structure, expenditures, and contributions. Vermont's PAC, electioneering communications, and MMA disclosure rules are consistent with that precedent and pass exacting scrutiny. Its $100 threshold for revealing PAC contributors easily meets the wholly without rationality standard announced in *Buckley*.

While FIPE avowedly makes only independent expenditures, the record before the Court reveals no clear accounting between it and PC, a fund that supports candidates directly. As such, Vermont is permitted to impose a $2000 limit on contributions FIPE may accept from individual sources. To hold otherwise, on this record, would allow the portion of *Citizens United* dealing with independent expenditure limits to shield political fundraising conducted by PACs that make contributions to candidates or engage in coordinated expenditures.

In so finding, the Court hereby orders:

1. Plaintiffs' motion for summary judgment, ECF No. 166, is **denied**.

2. Defendants' motion for summary judgment, ECF No. 168, is **granted**.

3. Defendants' motions to file summary judgment documents under seal are **denied as moot**.

4. There being no matters in the case outstanding, the Court directs the Clerk to **enter final judgment** in favor of the Defendants.

It is so ordered.

Dated at Burlington, in the District of Vermont, this 21st day of June, 2012.

/s/William K. Sessions III
William K. Sessions III
U.S. District Court Judge